UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| COLUMBIA RIVER ADVISORS, LLC,<br><br>　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>MKT AND ASSOCIATES, LLC et al.,<br><br>　　　　　　　　　Defendants. | CASE NO. 3:24-cv-05696-LK<br><br>ORDER DENYING MOTION FOR REMAND AND GRANTING IN PART AND DENYING IN PART MOTION FOR TEMPORARY RESTRAINING ORDER |

　　　　This matter comes before the Court on Plaintiff Columbia River Advisors, LLC's Emergency Motion for Remand and Attorneys' Fees and Costs; and in the alternative, Temporary Restraining Order. Dkt. No. 7. For the following reasons, the Court denies the motion for remand but grants in part the request for a temporary restraining order.

## I.　BACKGROUND

　　　　Plaintiff Columbia River Advisors, LLC ("Columbia River") is a registered investment advisory firm based in Tacoma, Washington. Dkt. No. 1-1 at 3. Defendant Brian Scalabrine was a founding member of Columbia River, and Defendant Matthew Keefe was hired in 2016. Dkt. No. 10 at 2; Dkt. No. 18 at 1. Keefe was hired as an employee with no ownership interest in Columbia

River. Dkt. No. 10 at 2; *see also* Dkt. No. 21-1 at 2. On July 1, 2017, Keefe became a member of Columbia River and executed a Restricted Unit Award ("RUA") Agreement that granted him restricted units equivalent to nine percent ownership in Columbia River in exchange for his agreement to non-competition and non-solicitation clauses. Dkt. No. 1-1 at 3, 16–18; Dkt. No. 21-1 at 2. Those clauses prohibited Keefe from (1) "contribut[ing] his . . . knowledge" to an entity engaged in the same or similar business for one year after leaving Columbia River, (2) soliciting other Columbia River employees for one year following his departure, and (3) "directly or indirectly, solicit[ing], contact[ing] . . . , attempt[ing] to contact or meet with" any "current, former or prospective" Columbia River client for three years after leaving the firm. *Id.* at 17–18. The RUA Agreement is governed by Washington law. *Id.* at 18.

On January 1, 2020, Keefe—along with Columbia River's three other members, Scalabrine, Benjamin Addink (the Managing Member at the time), and David Pruitte—signed an updated LLC agreement entitled "Restated Limited Liability Company Agreement" (hereinafter the "Operating Agreement"). Dkt. No. 1-1 at 22–49; Dkt. No. 10-2. The Operating Agreement increased Keefe's share in the company from nine percent to 31.67 percent. Dkt. No. 10-2 at 29. As relevant to Columbia River's motion, the Operating Agreement contains a provision permitting withdrawal of a member upon "approv[al] by Members holding a Unanimous Interest"; "no Member shall voluntarily resign or otherwise withdraw as a Member," and if such prohibited resignation or withdrawal occurs, the withdrawing member's distributions will be limited to "those distributions to which such Person would have been entitled had such Person remained a Member," and such distributions may be offset by monetary damages incurred as a result of the breach. Dkt. No. 10-2 at 9–10. The Operating Agreement also includes an arbitration provision, which states in relevant part:

ORDER DENYING MOTION FOR REMAND AND GRANTING IN PART AND DENYING IN PART MOTION FOR TEMPORARY RESTRAINING ORDER - 2

> **15.9. Dispute Resolution.** Any controversy, claim, or dispute arising out of or relating to this Agreement, or the alleged breach hereof shall be resolved by binding arbitration by one arbitrator subject to the sole jurisdiction of the Judicial Arbitration and Mediation Service of Pierce County, Washington ("J.A.M.S.").

*Id.* at 26. The Operating Agreement is governed by Delaware law. *Id.*

Beginning in late 2022, Keefe began to suspect that Addink was abusing his position as a Columbia River member by, among other things, mismanaging and misappropriating Columbia River funds. Dkt. No. 21-1 at 3. Keefe avers that he spent several months investigating Addink's actions and ultimately shared his concerns regarding "financial irregularities" with Scalabrine. Dkt. No. 21-1 at 3–4. In November 2023, Keefe and Scalabrine formed a firm named "MKT and Associates" without informing Addink and Pruitte. Dkt. No. 1-1 at 4. Then, on December 21, 2023, Keefe and Scalabrine convened a special meeting of Columbia River's members. *Id.* at 5; *see also* Dkt. No. 10-3 at 2. Though they were the only two members in attendance at the meeting, Keefe and Scalabrine voted to remove Addink as Columbia River's Managing Member and replace him with Keefe. Dkt. No. 1-1 at 4; Dkt. No. 10-3 at 2.

On January 8, 2024, Keefe signed Columbia River up for the Broker Protocol, which "is an agreement by financial advisory member firms to a process by which registered representatives . . . who leave one firm for another can contact their clients after leaving" if certain procedures are followed. Dkt. No. 1-1 at 5; Dkt. No. 10-6 at 2; *see also* Dkt. No. 8-3 at 2–4. The Broker Protocol provides that "[w]hen [registered representatives] move from one firm to another and both firms are signatories to th[e] protocol, they may only take the following account information: client name, address, phone number, email address, and account title of the clients that they serviced while at the firm," but they are otherwise "prohibited from taking any other documents or information." Dkt. No. 8-3 at 2.

ORDER DENYING MOTION FOR REMAND AND GRANTING IN PART AND DENYING IN PART MOTION FOR TEMPORARY RESTRAINING ORDER - 3

On January 17, 2024, Keefe applied for approval from Columbia River's Compliance Committee for his "outside business activity" relating to MKT, which he described as a "[c]onsulting [s]ervices" company that was not "an operating company" at that time and would not require any of his time or result in any compensation to him. Dkt. No. 1-1 at 60.[1] He agreed to "notify the Compliance Committee of any change" in that information, and further agreed "not to . . . share with [MKT] any information related to CRA and its activity, its clients, etc." *Id.* His request was approved the following day. *Id.*

On February 26, 2024, Keefe—as managing member of MKT—signed MKT up for the Broker Protocol. Dkt. No. 9-2 at 2. Beginning no later than July 26, 2024, Keefe authorized the transfer of various client information from Columbia River to MKT. *See* Dkt. No. 9 at 2; *see also* Dkt. No. 9-3 at 2 (July 26 and 30, 2024 messages regarding transferring client data to MKT); Dkt. No. 9-4 at 2 (July 28 and 31, 2024 requests from Keefe to eMoney to migrate Columbia River client data to MKT); Dkt. No. 9-5 at 2–3 (July 30, 2024 confirmation from Redtail regarding a scheduled August 1, 2024 client data transfer); Dkt. No. 19 at 2 ("In requesting the information from Redtail, some additional client data in addition to Protocol-compliant data was transferred into a new Redtail CRM database, which had the name keefe2."). The transfer included information from a Redtail database that included clients' social security numbers, annual income, dates of birth, names of children, and account balances. Dkt. No. 9 at 2; *see also* Dkt. No. 9-5 at 2–4.

On July 31, 2024, Keefe and Scalabrine each sent emails to Addink and Pruitte purporting to resign their membership from, and membership interests in, Columbia River, effective immediately. Dkt. No. 10-7 at 2; Dkt. No. 10-8 at 2. Keefe's email added the following: "In

---

[1] The Court notes that this approval appears to have been obtained pursuant to Columbia River's "Policies & Procedures Manual." *Id.* The parties have not submitted this Manual to the Court.

accordance with the terms of the broker protocol, I am providing a copy of my client information to . . . our CCO along with their account numbers." Dkt. No. 10-7 at 2.

MKT began operating the following day, and Keefe and Scalabrine immediately began soliciting Columbia River employees and clients. Dkt. No. 1-1 at 9–10; Dkt. No. 10 at 3. As of the filing of Columbia River's motion to remand, approximately 80 of Columbia River's clients had already moved to MKT, and many more "ha[d] informed CRA that they ha[d] been contacted by MKT or plan to move to MKT with Keefe." Dkt. No. 1-1 at 11; Dkt. No. 10 at 3. Based on these continued solicitations, Columbia River believes that more will move to MKT in the immediate to near future. Dkt. No. 1-1 at 9–10; Dkt. No. 10 at 3. If this occurs, Columbia River fears that it "faces the closure of its business[.]" Dkt. No. 1-1 at 10.

On August 23, 2024, Columbia River filed a complaint for injunctive relief against Defendants in Pierce County Superior Court. Dkt. No. 1-1. It filed a motion for a temporary restraining order ("TRO") three days later. Dkt. No. 1-2. Defendants removed the action to this Court on the same day, asserting diversity jurisdiction under 28 U.S.C. § 1332(a). Dkt. No. 1 at 2–3. On August 27, 2024, Columbia River filed the instant motion requesting that the Court remand the case back to state court or, in the alternative, grant a TRO restraining and enjoining Keefe, MKT, and their representatives from violating the RUA Agreement. Dkt. No. 7 at 1–2, 4–6, 8.

## II.   DISCUSSION

The Court first addresses Columbia River's motion for remand, *id.* at 1–6, and then proceeds to address Columbia River's motion for a TRO, *id.* at 6–23.

**A.   Motion for Remand**

1. Legal Standard

Removal of a civil action to federal district court is proper when the federal court would have original jurisdiction over the state court action. 28 U.S.C. § 1441(a). Once removed, the case

can be remanded to state court for either lack of subject matter jurisdiction or defects in the removal procedure. *See* 28 U.S.C. § 1447(c). District courts have diversity jurisdiction where no plaintiff and defendant are citizens of the same state and the amount in controversy is greater than $75,000. *See* 28 U.S.C. § 1332(a)(1); *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996). "The party seeking to invoke the district court's diversity jurisdiction always bears the burden of both pleading and proving diversity jurisdiction." *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 613–14 (9th Cir. 2016).

A remand motion challenging removal jurisdiction is evaluated under the same standards as a Federal Rule of Civil Procedure 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121–22 (9th Cir. 2014). Under that framework, where the moving party does not contest the removal notice's factual allegations but instead asserts that those allegations are facially insufficient to invoke federal jurisdiction, the court accepts the notice's factual allegations as true and draws all reasonable inferences in favor of the remover. *Id.* In contrast, when the movant raises a factual challenge by "contest[ing] the truth of the [remover's] factual allegations, usually by introducing evidence outside the pleadings," the remover "must support her jurisdictional allegations with 'competent proof' . . . under the same evidentiary standard that governs in the summary judgment context." *Id.* at 1121 (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 96–97 (2010)). The remover "bears the burden of proving by a preponderance of the evidence that each of the requirements for subject-matter jurisdiction has been met." *Id.* "Except when the factual dispute material to subject-matter jurisdiction is intertwined with an element of the plaintiff's claim, the district court may resolve the factual dispute itself." *DeFiore v. SOC LLC*, 85 F.4th 546, 553 (9th Cir. 2023).

2. There is Complete Diversity Between the Parties

Here, Columbia River does not dispute Defendants' allegations that the amount in

controversy exceeds $75,000, that Addink and Pruitte are citizens of Washington, that Keefe and Scalabrine are citizens of Arizona and Massachusetts, respectively, and that MKT is a citizen of Arizona and Massachusetts. Dkt. No. 1 at 3–4; *see generally* Dkt. No. 7; *see also* Dkt. No. 10 at 3 (Addink's declaration stating that "the loss of 80 clients to MKT equates to a total direct loss of $1,547,000 in recurring annual client advisory fees"). Rather, Columbia River contests Defendants' allegation that "the relevant citizenship of [Columbia River] is Washington State." Dkt. No. 1 at 3. Specifically, it argues that Keefe's and Scalabrine's email resignations were ineffectual under the Operating Agreement and Delaware law, so they are still members of Columbia River, thereby destroying complete diversity. Dkt. No. 7 at 4–6; *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006) ("[A]n LLC is a citizen of every state of which its owners/members are citizens.").

Defendants counter that the Operating Agreement "clearly contemplates that resignation can be effective even if it is not favored," as evidenced by Columbia River's actions and representations prior to Defendants' removal. Dkt. No. 16 at 8–10.

Defendants have the better argument. Although Delaware's LLC Act "does not grant members the right to resign prior to dissolution or winding up," *Robinson v. Darbeau*, No. CV 2019-0853-KSJM, 2021 WL 776226, at *11 (Del. Ch. Mar. 1, 2021), an LLC agreement may "provide[] otherwise," Del. Code Ann. tit. 6, § 18-603 (West 2024). Here, the Operating Agreement states as follows:

> **6.5 <u>Withdrawal of Member.</u>** Except as expressly permitted in this Agreement, no Member shall voluntarily resign or otherwise withdraw as a Member. Unless otherwise approved by Members holding a Unanimous Interest, a Member who resigns or withdraws shall be entitled to receive only those distributions to which such Person would have been entitled had such Person remained a Member (and only at such times as such distribution would have been made had such Person remained a member). The remedy for breach of this *Section 6.5* shall be monetary damages (and not specific performance), which may be offset against distributions by the Company to which such Person would otherwise be entitled.

1   Dkt. No. 10-2 at 9–10. Relying on the first clause of this provision, Columbia River concludes that

2   "[t]here are no express provisions in the Operating Agreement that permit withdrawal in these

3   circumstances." Dkt. No. 7 at 5. But, as Defendants observe, Dkt. No. 16 at 9, courts must "read

4   the contract as a whole and . . . give each provision and term effect, so as not to render any part of

5   the contract mere surplusage." *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393,

6   396–97 (Del. 2010). If Columbia River's members could never voluntarily resign or withdraw

7   their LLC membership absent the dissolution or wind up of the LLC, the second and third clauses

8   of the provision would be rendered meaningless. For example, Columbia River's insistence that

9   Keefe or Scalabrine must continue as members runs headfirst into the third clause's explicit

10  instruction that specific performance is not a remedy for breach.

11       Based on the record before it, the Court finds that a preponderance of the evidence supports

12  subject matter jurisdiction. *DeFiore*, 85 F.4th at 553; *see also Vaden v. Discover Bank*, 556 U.S.

13  49, 62 (2009) (a court may consider a dispute that may be subject to arbitration to ascertain whether

14  it has subject matter jurisdiction over the petition before it). The Court therefore denies Columbia

15  River's motion for remand.

16       However, to fulfill its independent duty to ascertain subject matter jurisdiction, the Court

17  requests supplemental briefing from Defendants regarding their citizenship. The record contains

18  scant evidence of Keefe's and Scalabrine's alleged domicile in Arizona and Massachusetts. Keefe

19  and Scalabrine each provided Washington addresses in the 2020 Operating Agreement. Dkt. No.

20  1-1 at 49. Scalabrine is still listed as the owner of the residential address he provided in that

21  Agreement. *See* King County Department of Assessments, Parcel 085300-0200,

22  https://blue.kingcounty.com/Assessor/eRealProperty/Dashboard.aspx?ParcelNbr=0853000200.

23  Furthermore, MKT's December 13, 2023 initial report lists Keefe's address as 12915 Foxglove

24  Dr. NW, Gig Harbor, WA 98332—a location that appears to be a residence. Dkt. No. 1-1 at 51;

ORDER DENYING MOTION FOR REMAND AND GRANTING IN PART AND DENYING IN PART MOTION FOR TEMPORARY RESTRAINING ORDER - 8

Pierce County Assessor-Treasurer Information Portal, Parcel 2827410720, https://atip.piercecountywa.gov/app/v2/propertyDetail/2827410720/summary. Keefe also signed his declaration from Washington. Dkt. No. 21-1 at 7. The MKT initial report lists an office address in California. Dkt. No. 1-1 at 51. And notably, Defendants' notice of removal does not independently allege their citizenship, and instead relies on Columbia River's allegations that were provided "upon information and belief." Dkt. No. 1 at 3; Dkt. No. 1-1 at 2–3. Accordingly, the Court requires additional evidence of Defendants' citizenship.[2] The Court cautions that it may impose sanctions for misrepresentations regarding a party's citizenship. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990).

### B. Motion for Temporary Restraining Order

Columbia River seeks a TRO restraining and enjoining Keefe, MKT, and their representatives from (1) "working in any capacity for a company competing with [Columbia River]," (2) directly or indirectly "soliciting, hiring, recruiting, attempting to hire or recruit, or inducing the termination of employment of any [Columbia River] employee," and (3) "contacting or soliciting [Columbia River]'s clients and potential clients, providing service to its clients, and from continuing any other violations of the [RUA Agreement]." Dkt. No. 7 at 1–2, 4–6, 8.

1. <u>Legal Standard</u>

Federal Rule of Civil Procedure 65 empowers the court to issue a TRO. Fed. R. Civ. P. 65(b). Like a preliminary injunction, a TRO is "an extraordinary remedy never awarded as of

---

[2] Because "[a] person residing in a given state is not necessarily domiciled there, and thus is not necessarily a citizen of that state," *Kanter v. Warner–Lambert Co.,* 265 F.3d 853, 857 (9th Cir. 2001), residence is only one factor in a domicile analysis. When the issue involves a change in domicile, additional principles of law apply. First, a change of domicile requires more than physical presence at the new location; it also requires evidence of an intent to remain there indefinitely. *Lew v. Moss,* 797 F.2d 747, 749–50 (9th Cir. 1986). Second, a person's old domicile is not lost until a new one is acquired. *Barber v. Varleta,* 199 F.2d 419, 423 (9th Cir. 1952). Derived from this general rule is the presumption in favor of an established domicile over one newly acquired. *Id.*; *see also, e.g., Fredericks v. Carpenter*, 233 F. App'x 616, 617–18 (9th Cir. 2007) (considering litigant's wife's domicile, location of car registration, office location, bank account location, and phone records to determine domicile).

right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (the standards applicable to TROs and preliminary injunctions are "substantially identical"). The Court will not "mechanically" grant an injunction for every violation of law. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). Instead, plaintiffs seeking a TRO must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. The "possibility" of irreparable harm is insufficient; the moving party must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* at 22.

The Ninth Circuit employs a "sliding scale" approach, under which the four elements are balanced "so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). For example, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a [TRO], so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135 (internal quotation marks omitted). The moving party bears the burden of persuasion and must make a clear showing that it is entitled to such relief. *Juarez v. Asher*, 556 F. Supp. 3d 1181, 1187 (W.D. Wash. 2021) (citing *Winter*, 555 U.S. at 22).

    2. <u>Defendants' Asserted Defenses Are Meritless</u>

        *(a) Unclean Hands*

Defendants first raise an "unclean hands" defense, arguing that the Court "can and should deny [Columbia River]'s request for a [TRO] because it is seeking equitable relief on behalf of its managing member, Addink, who engaged in intentional wrongful and potentially criminal behavior that was a direct cause of the conduct he and [Columbia River] now complain about."

Dkt. No. 16 at 11. Defendants allege that Addink abused his position as a Columbia River member by, among other things, mismanaging and misappropriating funds. *Id.* at 11–12. Even if these allegations are true, Defendants fail to connect these actions to Keefe's violation of the RUA Agreement in a manner that would preclude equitable relief in Columbia River's favor. *See Henderson v. United States*, 575 U.S. 622, 625 n.1 (2015) ("The unclean hands doctrine proscribes equitable relief when, but only when, an individual's misconduct has 'immediate and necessary relation to the equity that he seeks.'" (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)); *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985) ("[W]hat is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendants."), *abrogated on other grounds as recognized by Watkins v. Westinghouse Handford Co.*, 12 F.3d 1517 (9th Cir. 1993). "Factual similarity between the misconduct that forms the basis for an unclean hands defense and the plaintiff's allegations in the lawsuit is not sufficient," *Pom Wonderful LLC v. Welch Foods, Inc.*, 737 F. Supp. 2d 1105, 1110 (C.D. Cal. 2010); rather, "equity requires that those seeking its protection shall have acted fairly and without fraud or deceit *as to the controversy in issue*," *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987).

Defendants claim that "given [Addink's] transgressions and [his] unwillingness to assist in a remedy, Keefe and Scalabrine had to leave the company to protect their fiduciary relationships with their clients." Dkt. No. 16 at 12 (citing 15 U.S.C. § 80b-6(b)). But that is not necessarily true. *See, e.g.*, *Eureka VIII LLC v. Niagara Falls Hldgs. LLC*, 899 A.2d 95, 116 (Del. Ch. 2006) (recognizing the right of an LLC member or assignee to bring a derivative action on behalf of the LLC when another member breaches a contractual or fiduciary duty owed to the LLC); *AM Gen. Holdings LLC v. Renco Grp., Inc.*, No. CV 7639-VCS, 2019 WL 1567488, at *7 (Del. Ch. Apr.

ORDER DENYING MOTION FOR REMAND AND GRANTING IN PART AND DENYING IN PART MOTION FOR TEMPORARY RESTRAINING ORDER - 11

10, 2019) (suggesting that expulsion could be an equitable remedy for breach of fiduciary duties). Nor do Defendants explain why they "had to" solicit Columbia River's employees and clients. The Court finds that Addink's alleged misconduct is not, on its own, sufficiently related to Columbia River's requested relief to preclude issuance of a TRO.

### (b) Arbitration Provision

Defendants next contend that Columbia River's lawsuit should be barred because it was required to arbitrate this dispute pursuant to the Operating Agreement. Dkt. No. 16 at 13; *see also* Dkt. No. 10-2 at 26. This action, however, does not arise out of the Operating Agreement, but out of the RUA Agreement, which does not include an arbitration provision. *See generally* Dkt. No. 10-1. Furthermore, as explained below, the Operating Agreement did not supplant or invalidate the RUA Agreement. Defendants' argument is therefore meritless.

### 3. Columbia River is Entitled to a TRO

#### (a) Likelihood to Succeed on the Merits

Columbia River contends that it is likely to prevail on the merits of its claim that Keefe breached his obligations in the RUA Agreement. Dkt. No. 7 at 17–20.[3] To prevail on its breach of contract claim, Columbia River must demonstrate that a contract imposed a duty on Keefe, that he failed to perform that duty, and that Keefe's breach proximately caused damages to Columbia River. *Nw. Indep. Forest Mfrs. v. Dep't of Lab. & Indus.*, 899 P.2d 6, 9 (Wash. 1995).

Columbia River contends that Keefe breached all three non-competition and non-solicitation provisions of the RUA Agreement. Dkt. No. 7 at 17–20. Based on the record, the Court agrees. First, Keefe helped form and operate MKT, a competing investment advisory services firm.

---

[3] Columbia River also contends that it is likely to prevail on its claim that Keefe and Scalabrine violated their fiduciary duties. *Id.* at 17, 20–22. But its complaint does not contain any such claim. *See* Dkt. No. 1-1 at 10–12. A plaintiff is not entitled to injunctive relief for claims not pleaded in the complaint because the "court's equitable power lies only over the merits of the case or controversy before it." *Pacific Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015).

ORDER DENYING MOTION FOR REMAND AND GRANTING IN PART AND DENYING IN PART MOTION FOR TEMPORARY RESTRAINING ORDER - 12

Dkt. No. 10 at 3; Dkt. No. 21-1 at 4. Second, Keefe contacted at least two Columbia River employees to try to convince them to leave Columbia River and work at MKT. Dkt. No. 9-7 at 2; Dkt. No. 21-1 at 6. And third, Keefe and MKT have solicited hundreds of Columbia River clients, and many of them have moved to MKT. Dkt. No. 1-1 at 11; Dkt. No. 10 at 3; *see also* Dkt. No. 21-1 at 6. The record supports Columbia River's contention that Keefe has breached, and is likely to continue breaching, the RUA Agreement.

Defendants do not challenge these factual allegations, but instead argue that there is no breach because the RUA Agreement is no longer valid due to extinguishment of the consideration for the Agreement. Dkt. No. 16 at 13. Specifically, they argue that the Operating Agreement eliminated the class of units Keefe was granted via the RUA Agreement in favor of a different class of shares, meaning the consideration Keefe received at the time he entered into the RUA Agreement is technically worthless now. *Id.* at 13–14. But this elevates form over substance: the RUA Agreement provided Keefe a nine percent interest in Columbia River, which he enjoyed for three years, and which did not disappear or become worthless after the Operating Agreement was executed. Instead, the Operating Agreement just increased his share to 31.67 percent. Dkt. No. 10-2 at 29. And there is nothing in either the RUA Agreement or Operating Agreement indicating that the execution of the Operating Agreement would supersede, nullify, or void the RUA Agreement. *See generally* Dkt. Nos. 10-1, 10-2. Indeed, the RUA Agreement anticipates changes to the LLC agreement: Section 5 states that "[i]f any change is made to the outstanding Units or the capital structure of the Company, if required, the United shall be adjusted proportionately to such capital structure adjustments." Dkt. No. 1-1 at 17. Furthermore, "[t]he Committee has the right to amend, alter, discontinue or cancel the Restricted Unit, prospectively or retroactively; *provided, that*, no such amendment shall adversely affect [Keefe's] material rights under this Agreement without the Grantee's consent." *Id.* at 19. The Operating Agreement did not alter Keefe's rights under the

ORDER DENYING MOTION FOR REMAND AND GRANTING IN PART AND DENYING IN PART MOTION FOR TEMPORARY RESTRAINING ORDER - 13

Agreement except to increase his share of the company. Therefore, based on the record, the Operating Agreement did not supersede the RUA Agreement.[4]

Defendants also claim that because Keefe and Scalabrine substantially complied with the Broker Protocol, "[Columbia River]'s allegations of violations of the data-sharing and solicitation provisions" of the Operating Agreement fail. Dkt. No. 16 at 14–15. It is not clear to the Court what allegations Defendants are referring to, given that Columbia River does not appear allege a violation of the Operating Agreement in its complaint or TRO motion and the Operating Agreement does not appear to include data-sharing or solicitation provisions. *See generally* Dkt. Nos. 1-1, 7, 10-2. To the extent Defendants are contending that the Broker Protocol supersedes the non-competition and non-solicitation provisions of the RUA Agreement, or otherwise acts as a shield against liability for Defendants, that argument fails for at least four reasons.

First, the Broker Protocol aims to accommodate, rather than displace, prior agreements: Columbia River "continue[s] to be free to enforce whatever contractual . . . restrictions exist on the solicitation of customers to move their accounts by a departing [representative] before he or she has left the firm"; in addition, to the extent the RUA Agreement is a "team/partnership agreement," its terms govern for which clients Keefe "may take Client Information and which clients [he] can solicit." *Id.* at 57.[5] Keefe's agreement "not to . . . share with [MKT] any

---

[4] Defendants argue that Keefe "understood that the Operating Agreement was a substitute for any prior agreements he had with the company, including the RUA Agreement." Dkt. No. 16 at 14; *see also* Dkt. No. 21-1 at 2. But the unexpressed subjective intent of a party does not override the plain language of the contract under either Washington or Delaware law. *See Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005); *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018). It is clear from the contracts' language that the purpose of the RUA Agreement is to govern non-competition and non-solicitation obligations relating to Keefe's ownership in the firm, while the Operating Agreement broadly governs the operation of the LLC. These are two separate agreements aimed at different things, and there is no evidence that the four members of the LLC intended to terminate Keefe's RUA Agreement by executing the Operating Agreement. If they did, they could have easily said so. *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1035 (Del. Ch. 2006) ("[C]ourts should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.").

[5] *See also UBS Fin. Servs., Inc. v. Christenson*, No. CV 13-1081 (MJD/JSM), 2013 WL 2145703, at *4 (D. Minn. May 15, 2013) ("[I]t is likely that the Protocol does not apply here because the Protocol does not supersede a written

ORDER DENYING MOTION FOR REMAND AND GRANTING IN PART AND DENYING IN PART MOTION FOR TEMPORARY RESTRAINING ORDER - 14

information related to CRA and its activity, its clients, etc," Dkt. No. 1-1 at 60—executed after he enrolled Columbia River in the Broker Protocol, Dkt. No. 10-6 at 2—suggests that the parties did not believe or intend that the Protocol displace other agreements. Second, even assuming that the Broker Protocol applies to Keefe and MKT and supersedes the RUA Agreement's provision regarding the solicitation of customers, it does not supplant Section 7.1(b) regarding solicitation of employees, and does not necessarily displace Section 7.1(a). *See* Dkt. No. 8-3 at 2. Third, the record suggests that Keefe and MKT violated the Broker Protocol by transferring more data than what is permitted under the Protocol from Columbia River to MKT, rendering the Broker Protocol protections void. *See* Dkt. No. 9 at 2; *see also* Dkt. No. 9-3 at 2; Dkt. No. 9-4 at 2; Dkt. No. 9-5 at 3.[6] Although Defendants contend that Keefe and Scalabrine "substantially complied with the Protocol upon departure" because they have not "downloaded or used any non-Protocol compliant data for those clients," Dkt. No. 16 at 14–15; *see also* Dkt. No. 21-1 at 6, a violation of the Broker Protocol (and applicable law regarding data privacy and disclosure) can be based on the "taking" of non-sanctioned documents or information, not just the "use" of such documents, Dkt. No. 1-1 at 56–57. Moreover, Scalabrine does not appear to be a "registered representative," Dkt. No. 18 at 1; *see also* Dkt. No. 16 at 4–5, and therefore may not avail himself of the protections of the Broker

---

financial advisor team agreement."); *Archford Cap. Strategies, LLC v. Davis*, 226 N.E.3d 63, 72 (Ill. Ct. App. 2023) (finding that the Protocol's language did not necessarily abrogate a prior employment agreement regarding compensation to firm for client transfer), *appeal denied,* 214 N.E.3d 110 (Ill. 2023); *cf. In re Next Fin. Grp., Inc.*, Exchange Act Release No. 349, 93 SEC Docket 1369, 2008 WL 2444775, at *28 (June 18, 2008) (suggesting that information sharing under the Broker Protocol does not supersede applicable law regarding sharing of nonpublic personal information).

[6] Some courts have found that a showing of bad faith in violation of the spirit of the Broker Protocol by a departing financial advisor prevents the Protocol and its protections from applying. *See, e.g.*, *Morgan Stanley Smith Barney LLC v. O'Brien*, No. 3:13-CV-01598 (VLB), 2013 WL 5962103, at *4–5 (D. Conn. Nov. 6, 2013) (finding that departing financial advisor who altered his clients' contact information in his employer's database before tendering resignation letter violated the Broker Protocol even though he was in compliance "with the *technical* aspects of the Protocol"); *Morgan Stanley & Co. v. Choy*, No. 1:08-cv-00467-HG-KSC, Dkt. No. 23 at 18–20 (D. Haw. Oct. 29, 2008) (finding violation of Broker Protocol's spirit where departing financial advisors removed physical client files from previous firm and mailed those files to clients for safekeeping prior to departure from previous firm).

Protocol.[7]

The Court therefore finds that Columbia River has demonstrated a likelihood of success on the merits.

*(b) Likelihood of Suffering Irreparable Harm in the Absence of Preliminary Relief*

While "monetary injury is not normally considered irreparable, . . . the threat of being driven out of business is sufficient to establish irreparable harm." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (cleaned up). The Ninth Circuit has determined that "showing a threat of 'extinction' is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable." *Id.* (quoting *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985)). "The loss of an ongoing business representing many years of effort and the livelihood of its owners . . . cannot be fully compensated by subsequent monetary damages." *Id.* (cleaned up).

Here, Columbia River states that it has already lost 80 clients to MKT, and approximately 166 clients remain. Dkt. No. 7 at 15. These 80 lost clients represent over $1.5 million in recurring annual fees. *Id.* Columbia River also contends that its remaining clients are continuously being siphoned away by Defendants, and absent injunctive relief, Defendants' solicitation will likely result in the closure of Columbia River's business. Dkt. No. 7 at 21–22; *see also* Dkt. No. 10 at 3–4. The Court finds that the evidence in the record supports Columbia River's allegation of likely and immediate irreparable harm.

The Court notes, however, that this harm appears to be due entirely to Defendants' solicitation of, and provision of services to, Columbia River clients. Columbia River does not

---

[7] The Court further observes that MKT's and Keefe's actions may fall under the "raiding" exception in the Broker Protocol. Dkt. No. 1-1 at 56 (raiding exception); Dkt. No. 1-1 at 11 (a significant number of clients "have informed CRA that they have been contacted by MKT or plan to move to MKT with Keefe"); Dkt. No. 9 at 3 ("Keefe told me that it would be in my best interest to leave CRA because CRA was not going to last long."); *see Salomon & Ludwin, LLC v. Winters*, No. 3:24-CV-389-HEH, 2024 WL 3511629, at *5 (E.D. Va. July 23, 2024).

ORDER DENYING MOTION FOR REMAND AND GRANTING IN PART AND DENYING IN PART MOTION FOR TEMPORARY RESTRAINING ORDER - 16

allege any likely or immediate irreparable harm from permitting Defendants to operate a company competing with Columbia River apart from taking Columbia River's clients. *See generally* Dkt. No. 7. Nor does Columbia River allege any likely or immediate irreparable harm from Defendants' solicitation of individuals who are not clients of Columbia River but are rather only "potential" clients.

### (c) Balance of Equities

Columbia River states that the harm it would experience due to client loss if temporary injunctive relief were denied "outweighs any potential harm to Defendants," who would not be prevented by the requested TRO "from operating [their] business or from soliciting potential clients with no connection to Columbia River[.]" Dkt. No. 7 at 22. Defendants do not dispute Columbia River's characterization of the balance of equities and do not otherwise claim any harm from a TRO other than alleged harm to clients from an inability to use the advisor of their choice. *See generally* Dkt. No. 16.

Contrary to its representation that MKT could continue to operate if a TRO were issued, Columbia River explicitly seeks to enjoin Defendants "from working in any capacity for a company competing with Columbia River until the preliminary injunction hearing." Dkt. No. 7 at 8. This requested relief is at odds with Columbia River's claim that Defendants will not suffer harm if the Court issues a TRO. And again, Columbia River has not catalogued any potential harm from Defendants' solicitation of non-clients.

The balance of equities therefore tips in Columbia River's favor with regard to its requests to enjoin Defendants from soliciting Columbia River employees or clients, but tips in Defendants' favor with regard to Columbia River's request to enjoin Defendants from working for MKT or a similar company and from soliciting non-clients.

      *(d) Public Interest*

      Finally, Columbia River contends that a TRO is in the public interest because it would "preserve the status quo, allowing Columbia River the space and time to communicate with its clients and advise them." Dkt. No. 7 at 23. Columbia River states that its clients "are welcome to seek advisory services from advisors at Columbia River or from any number of other advisors," and that a TRO would "not adversely impact these clients' receipt of advisory services for a limited period of time." *Id.* Defendants counter that granting Columbia River's requested TRO would impede clients' "right[s] to choose their financial advisors and know when they change firms." Dkt. No. 16 at 18. Defendants also protest that Columbia River's proposed TRO would "prohibit[] Keefe from working as a financial advisor for an entire year, . . . depriving his existing clients of representation regardless of whether they were formerly Columbia River clients," and would enjoin Keefe from "'contacting any client or customer of [Columbia River], or accepting any [Columbia River] customer as an MKT client,' rights far beyond what it would be entitled to under the terms of its agreements." *Id.* (quoting Dkt. No. 7-2 at 4). And finally, Defendants complain that the injunction would "prevent[] communications in violation of the First Amendment." *Id.*

      Defendants' First Amendment argument is frivolous. Columbia River is a private party, not a government actor. "A threshold requirement of any constitutional claim is the presence of state action." *Roberts v. AT&T Mobility LLC*, 877 F.3d 833, 837 (9th Cir. 2017). Defendants also err in describing the breadth of the requested TRO; it seeks relief not for a year, but only until the preliminary injunction hearing. Dkt. No. 7-2 at 4. Although the Court acknowledges Keefe's concerns regarding the scope of the non-competition and non-solicitation provisions in the RUA Agreement, such scope is largely immaterial for the purposes of the temporary relief sought by Columbia River in its motion. And while the Court appreciates clients' interests in choosing their own financial advisor without restriction, "the freedom to pursue one's chosen occupation is in

tension with freedom of contract, and the advocate of competition must grapple with the argument that noncompete agreements are economically advantageous because they protect costly investments." *Ocean Beauty Seafoods, LLC v. Pac. Seafood Grp. Acquisition Co., Inc.*, 648 F. App'x 709, 712 (9th Cir. 2016).

The Court therefore finds that the public interest does not weigh in any party's favor, and therefore does not bear substantial weight at this stage.

\* \* \*

Because Columbia River has demonstrated a likelihood to succeed on the merits, a likelihood of immediate irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that preliminary injunctive relief would not be against any public interest, the Court grants its motion for a TRO, but only with respect to its request to enjoin Defendants from soliciting Columbia River employees and clients. Dkt. No. 7 at 8. The Court denies Columbia River's request to enjoin Defendants from working in any capacity for a company competing with Columbia River, and from soliciting potential Columbia River clients. *Id.*

### III.  CONCLUSION

For the foregoing reasons, the Court ORDERS the following:

1. Columbia River's motion for remand, Dkt. No. 7 at 1–6, is DENIED.

2. Columbia River's motion for a TRO, *id.* at 6–23, is GRANTED IN PART and DENIED IN PART.

3. Defendants and all of their respective officers, agents, servants, employees, attorneys, and persons acting in concert or participation with them (collectively, the "Enjoined Parties") are hereby ENJOINED from:

    (a) directly or indirectly soliciting, hiring, recruiting, attempting to hire or recruit, or inducing the termination of employment of any Columbia River employee; and

    (b) contacting or soliciting Columbia River's clients and providing service to its clients;

    (c)    provided, however, that the Enjoined Parties may provide a copy of this Order to any Columbia River clients who have transitioned, or who are in the process of transitioning, their business to MKT; and may communicate with such clients solely for the purpose of complying with the Court's directive that the Enjoined Parties may not provide service to such clients (e.g., in connection with transitioning such clients' accounts back to Columbia River). The Enjoined Parties may not advise any clients to transition their business to any individual or entity other than Columbia River.

For purposes of this Order, Columbia River "employees" and "clients" include those individuals and entities who had such status as of July 30, 2024.

4. No security bond is required under Federal Rule of Civil Procedure 65(c). *See* Dkt. No. 1-1 at 18 (Columbia River "shall be entitled to seek . . . a temporary or permanent injunction . . . without the necessity of posting any bond or other security"); *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009).

5. Pursuant to Federal Rule of Civil Procedure 65(d)(2), this Order is binding on those persons who receive actual notice of this Order, if those persons are an officer, agent, servant, employee, or attorney of Defendants or if they are acting in active concert or participation with Defendants.

6. Unless extended by the Court, this TRO expires fourteen days from entry.

7. If Columbia River intends to seek a preliminary injunction, the Court will hold a hearing on such motion at 10:00 a.m. on September 17, 2024. Associated briefing deadlines are as follows:

   (a) September 6, 2024: Deadline for Columbia River to file a motion for preliminary injunction of no more than 4,200 words.

   (b) September 10, 2024: Deadline for Defendants' response of no more than 4,200 words.

   (c) September 13, 2024 at 12:00 p.m.: Deadline for Columbia River's reply of no more than 2,100 words.

8. Defendants' supplemental briefing regarding their citizenship must be provided in their response brief to Columbia River's preliminary injunction motion, or, if no such motion is filed, must be submitted to the Court no later than September 9, 2024.

Dated this 3rd day of September, 2024.

_Lauren King_
Lauren King
United States District Judge